## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAN WILLEY, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMPLITUDE INC., | |
| Defendant. | |

Plaintiff Sean Willey ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant Amplitude, Inc. ("Defendant") for wiretapping the electronic communications of Pennsylvania users of Oscar Health, Inc.'s ("Oscar") website, hioscar.com (the "Website"), and Oscar Health app (the "App").

2.      Oscar Health is a health insurance provider that claims to use technology to provide better insurance to its members.[1]  Oscar Health has approximately 1.6 million members and offers health insurance plans in twenty states, including the Commonwealth of Pennsylvania.[2]

3.      Defendant provides to website and app developers like Defendant a software-as-a-service ("SaaS") that is also called "Amplitude."  The Amplitude Service consists of a software

---

[1] ABOUT US, https://www.hioscar.com/about.

[2] OSCAR GEOGRAPHICAL FOOTPRINT, https://www.hioscar.com/about/oscar-geographical-footprint

development kit ("SDK") and application programming interface ("API"). An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[3]

4.    An API is a piece of technology that can be installed onto a website to "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[4]

5.    Through the Amplitude Service, Defendant—an undisclosed and unconsented-to third party eavesdropper—intentionally intercepts and acquires the electronic communications between Plaintiff and Class Members, on the one hand, and Oscar, on the other that are conducted on the Website and App. These electronic communications include Website users' Personally Identifiable Information ("PII") and Personal Health Information ("PHI"), such as users' prescription medications and medical conditions.

| THIRD PARTY | WIRETAPPING INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| Amplitude | Prescriptions, Medical Conditions | Income, Zip Code & State | Device ID |

6.    Through these acts, Defendant violated Pennsylvania's Wiretapping and Electronic Surveillance Act ("WESCA"), 18 Pa. Cons. Stat. §§ 5701, *et seq*.

7.    Plaintiff brings this action on behalf of himself and a Class of all Pennsylvania residents whose electronic communications were intercepted through the use of Defendant's

---

[3] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[4] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

wiretap on the Website and App.

## THE PARTIES

8.      Plaintiff Sean Willey is a resident of Marietta, Pennsylvania, and has an intent to remain there, and is therefore a citizen of Pennsylvania.  In or about March 2023, prior to the filing of this lawsuit, Plaintiff Willey visited the Website.  Plaintiff was in Marietta, Pennsylvania when he visited the Website.  During the visit, Plaintiff Willey's electronic communications—including Plaintiff Willey's medical conditions, prescriptions, zip code and state, income, and device ID— were intercepted, acquired, and read in real time by Defendant Amplitude through its Amplitude Service.  Plaintiff Willey was unaware at the time that his electronic communications, including the information described above, were being intercepted in real-time and disclosed to Amplitude, nor did Plaintiff Willey provide his prior consent to the same.

9.      Defendant Amplitude, Inc. is a Delaware corporation with its principal place of business at 201 3rd Street, Suite 200, San Francisco, CA 94103.  Defendant entered into a contract with Oscar Health, Inc. to operate the Website in multiple states in the United States, including the State of New York.

10.      Amplitude is a marketing software-as-a-service ("SaaS") company.  At all relevant times here, Oscar Health procured or otherwise enabled the Amplitude Service on the Website.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant contracted with Oscar Health for the provision of its services in the State of New York, where Oscar Health is headquartered.   Plaintiff's claims relate to the contract between Defendant and Oscar Health, as this contract is the reason Amplitude was operating on the Website.

13.     Venue is proper to pursuant 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

**I.     DEFENDANT INTERCEPTS, ACQUIRED, AND READS THE ELECTRONIC COMMUNICATIONS OF OSCAR HEALTH USERS, INCLUDING USERS' PII AND PHI**

14.     Prior to the commencement of this action, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Website and App.  A "dynamic analysis" records the transmissions that occur from a user's device.

15.     The private researchers tested what information (if any) was disclosed when a user goes through the process of obtaining quotes for insurance on the Website and App.

16.     The dynamic analysis first established that the Amplitude Services operate on the Website and App.  The dynamic analysis then found that when a user goes through the process of submitting information for a health insurance quote, Defendant intercepts, acquires, and reads the electronic communications of Oscar Health users, on the one hand, and Oscar Health, on the other hand.  Those electronic communications divulge at least the following information: users' (i) prescriptions, (ii) medical conditions, (iii) income level, (iv) state and zip code, and (v) a unique Device ID.

| THIRD PARTY | WIRETAPPING INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Amplitude** | Prescriptions, Medical Conditions | Income, Zip Code & State | Device ID |

17.    Amplitude intercepts Oscar Health users' PII and PHI as users progress through the process of submitting information for a health insurance quote.   In other words, Amplitude intercepts and acquires information that (i) is actively and affirmatively inputted by users by typing information into form fields or selecting options on the Website and the App, and (ii) is intercepted contemporaneously with users inputting information into the Website and the App.

18.    When a user visits the Website or App, he or she is presented with the opportunity to "Find a Plan."



19.    Upon clicking this option, the user is told that they'll "be leaving the Oscar website [or app] to discover a variety of Oscar plans available and select the one that's right for you."  It

is once users begin "discover[ing]" these plans that Amplitude begins "discovering" users' PII and PHI via users' electronic communications with Oscar.

20.    *First*, users are asked to input their zip code information into a form field. Amplitude intercepts this information once the form field is submitted (*i.e.*, contemporaneously with the user's communication to the Website or App):



21.    *Second*, after selecting whether the plan is for the user or a family member, users are asked to input their birthday, gender, whether they are a tobacco user, and whether they are enrolled or entitled to Medicare. Amplitude intercepts whether the user is a tobacco user and whether they are enrolled or entitled to Medicare once the user clicks "Next" (*i.e.*, contemporaneously with the user's communication to the Website or App):



22.    *Third*, after inputting this information, users are given plan estimates by Oscar.  At this juncture, users can input what medications they take or conditions they have to see how these options fit into the plan:



23.    *Fourth*, if a user elects to add health conditions to the plan, the user can select from a bevvy of health conditions they may or may not have.  Amplitude acquires each of these health conditions contemporaneously with the user communicating that information to Oscar (*i.e.*, by clicking "Add" or "Save").  So, in the below example, Amplitude intercepted and learned that the user has asthma and depression (signified by those values being "true") but not other conditions:



24.    *Fifth*, if a user elects to add medications to the plan, the user can search for and add that medication.  Amplitude acquires each of these medications contemporaneously with the user communicating that information to Oscar (*i.e.*, by clicking "Add" or "Save").  So, in the below example, Amplitude intercepted and learned that the user is taking Seroquel, which is an antipsychotic medication that treats conditions such as schizophrenia and bipolar disorder:



[{"device_id":"uSGTd4YuUQWVW-_PCfOyqT","user_id":null,"timestamp":1712696291562,"event_id":24,"session_id":1712696211966,"event_type":"EC Shopping: Personalize: Drug Added","version_name":null,"platform":"Web","os_name":"Chrome","os_version":"123","device_model":"Macintosh","device_manufacturer":"Apple","language":"en-US","api_properties":{},"event_properties":{"agency_code":"oscar","current_url":"https://oscar.stridehealth.com/shop/plans/recommended","pageview_name":"Oscar - Shop","drug_name":"SEROQUEL","number_of_drugs":1},"user_properties":{},"uuid":"4865f0f9-0789-4dce-a0fc-24b84631a702","library":{"name":"amplitude-js","version":"8.21.9"},"sequence_number":28,"groups":{},"group_properties":{},"user_agent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.36","partner_id":null}]
    upload_time: 1712696291563
    v: 2

25.   *Finally*, a user can choose to enter their household size and income to further customize their health insurance plan.   Again, Amplitude intercepts that information contemporaneously when a user communicates it to Oscar (*i.e.*, when a user hits "Save" or another button indicating submission):



[{"device_id":"Dp4Eqv_Dced9OfRep-XFF4","user_id":null,"timestamp":1710958116123,"event_id":10,"session_id":1710958020501,"event_type":"EC Shopping: Income Calculator: Calculate Subsidies","version_name":null,"platform":"Web","os_name":"Chrome","os_version":"122","device_model":"Macintosh","device_manufacturer":"Apple","language":"en-US","api_properties":{},"event_properties":{"agency_code":"oscar","current_url":"https://oscar.stridehealth.com/shop/household","pageview_name":"Oscar - Shop","aptc":342.65,"estimated_income":35000,"income_added":35000,"household_size":1,"subsidy_elig":true,"csr_elig":"CS73"},"user_properties":{},"uuid":"481ccbc7-76d8-4d14-8e11-c4dcb6d86602","library":{"name":"amplitude-js","version":"8.21.9"},"sequence_number":14,"groups":{},"group_properties":{},"user_agent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/122.0.0.0 Safari/537.36","partner_id":null}]
    upload_time: 1710958116123
    v: 2

26.    As the above snippets of the dynamic analysis indicate, and despite the sensitive nature of the information collected, none of the PII or PHI is collected in encrypted or redacted format to Defendant.

27.    Users are not anonymous during this process either.  Defendant links each of the aforementioned communications together with (i) a unique Device ID that comes from the user's device and carries throughout each page of the session, and (ii) a unique session ID that likewise links the user's entire visit to the Website or App together.

28.    A user's "Device ID" is either the Identity for Vendors ("IDFV") or a random alphanumeric string on the App, or a randomly-generated Universally Unique Identifier ("UUID") on the Website.  "After gathering the device … IDs, Amplitude generates the Amplitude ID and associates it with the … device IDs it has already collected for this user."[5]  Establishing the Amplitude ID means Amplitude has "enough information to conclusively identify a unique user."[6]

29.    Once Amplitude has set an Amplitude ID, Amplitude maps and merges all events associated with that Amplitude ID and Device ID into one user profile.

30.    Amplitude intercepts and acquires all of this information without any notice to the user, and without either Defendant or Oscar asking users whether they consent to Amplitude's wiretapping.  Thus, users to the Website and App do not provide their prior consent to Defendant's interception of their electronic communications.

---

[5] TRACK UNIQUE USERS, https://amplitude.com/docs/data/sources/instrument-track-unique-users #how-amplitude-identifies-unique-users.

[6] HOW AMPLITUDE IDENTIFIES YOUR USERS, https://amplitude.com/docs/get-started/identify-users.

II.  **DEFENDANT USES THE INTERCEPTED INFORMATION TO TRAIN AND IMPROVE ITS SERVICES AND BOLSTER OSCAR'S MARKETING, ADVERTISING, AND ANALYTICS EFFORTS**

31.  Defendant's interception of Plaintiff's and Class Members electronic communications with Oscar is in no way innocuous. On the contrary, Defendant monetizes this sensitive PII and PHI for the benefit of itself and its customers.

32.  Defendant is a digital analytics platform that allows its clients like Oscar—and by extension, Defendant itself—to "[s]ee everything that customers do, understand what drives growth, and accelerate business outcomes."[7]

33.  Defendant offers a number of services that are employed by Oscar on the Website and that result in Defendant intercepting the electronic communications of users. For instance, Defendant offers an AI feature called "Ask Amplitude," which "uses [its clients'] taxonomy and business context to build and edit charts using natural language."[8] In other words, Defendant acquires, learns, and compiles its clients' end users' information into insights and actionable analytics. These analytics are then used by Defendant's to bolster their marketing and advertising efforts by improving customer engagement.

34.  Defendant also targets its services directly at the healthcare industry, noting its healthcare customers can "[e]asily integrate Amplitude into your current digital ecosystem, including marketing, messaging, data lakes, patient systems, and more." For instance, Defendant notes it can allow its healthcare customers—and again, by extension, Defendant—to "[u]ncover the impact of marketing and discover which channels and campaigns result in the most patients

---

[7] BUILD GREAT DIGITAL PRODUCTS & EXPERIENCES, https://amplitude.com/digital-analytics-platform

[8] AMPLITUDE ANALYTICS, https://amplitude.com/amplitude-analytics.

booking appointments, paying bills, filling prescriptions, and more."[9]

35.    Defendant also provides a "Recommendation Engine" that "predict[s] which content, products, or services a customer is likely to consume or engage with" "based on their own data."  Specifically, Defendant's Recommendation Engine based on, among other things, "[a] customer's past behaviors and history."  Notably, as alleged below the Recommendation Engine "use[s] machine learning," which Defendant trains and improves based on users' electronic communications.[10]

36.    Defendant also uses the intercepted information for its own benefit.  For instance, Defendant's Main Service Agreement between Defendant and its customers grants Defendant the right to "use techniques such as machine learning in order to improve the Services, and Customer instructs Amplitude to process its Customer Data for such purpose."[11]  In other words, Defendant is able to use the "Customer Data" it collects (*e.g.*, the information of users to the Website) to improve its AI functionality that is at the heart of many of Defendant's services.

37.    Defendant also admits that it uses "Subprocessors to Process Personal Data in connection with the provision of the Amplitude Services."[12]  This means Defendant *further discloses* any information it intercepts to other, undisclosed third parties.  These include, but are not limited to, Amazon, Datadog, and OpenAI.[13]

38.    Notably, Defendant does not even feign attempting to comply with the law.

---

[9] AMPLITUDE FOR HEALTHCARE, https://amplitude.com/industry/healthcare.

[10] WHAT IS A RECOMMENDATION ENGINE? HOW RECOMMENDERS WORK, https://amplitude.com/blog/recommendation-engine.

[11] AMPLITUDE, INC. MAIN SERVICE AGREEMENT, https://amplitude.com/msa#3-3.

[12] DATA PROCESSING ADDENDUM FOR TERMS OF SERVICE, https://amplitude.com/terms/dpa

[13] AMPLITUDE SUBPROCESSOR LIST, https://www.amplitude.com/subprocessor-list.

Instead, Defendant passes the buck onto its customers to ensure compliance with any laws.[14]

39.    The information collected by Defendant is not anonymous.  Oscar Health employs another third-party vendor on its website, Tapad, which is part of Experian.[15]

40.    Tapad provides "identity resolution solutions," which allows companies to "better understand consumers by unifying digital identifiers to create holistic customer profiles."[16]  In plain English, this means that Tapad "analyze[s] internet and device data and predict[s] whether two or more devices are owned by the same person.  Participating websites and apps then cater their advertisements based on a collective knowledge of the user's actions across all of their devices."[17]  Or, to put it another way, Tapad identifies users across devices based on analyzing and pooling various identifiers.

41.    Tapad's ability to identify users is startlingly accurate.  "In a data sample tested by Nielsen, Tapad accurately identified users across devices in 91.2% of cases.  This is only slightly less than deterministic methods which require PII."[18]

42.    Accordingly, because Oscar Health employs Tapad on its Website in conjunction with Defendant, both Oscar Health and Defendant are able to conglomerate the information Defendant collects and identify users.

43.    Further bolstering Defendant's ability to identify users, Defendant integrates its service with a number of other third parties, including but not limited to Facebook, Google,

---

[14] *Id*.

[15] https://www.tapad.com/.

[16] https://www.experian.com/marketing/consumer-sync/identity-resolution.

[17] https://en.wikipedia.org/wiki/Tapad.

[18] *Id*.

SnapChat, and TikTok.[19]

## III.    PLAINTIFF'S EXPERIENCE

44.    In or about March 2023, Plaintiff visited the Website while in Pennsylvania. During that visit, Plaintiff selected the "Find A Plan" option and entered information into the Website (while in Pennsylvania) to see which plans he was eligible for.  Upon being presented with potential plans, Plaintiff added information about his medications and health conditions to further customize his potential plan with Oscar.  Plaintiff ultimately purchased a health insurance plan with Oscar for which he still makes payments.

45.    As Plaintiff communicated with the Oscar Website by entering in his PII and PHI, Defendant contemporaneously intercepted, acquired, and read the contents of Plaintiff's electronic communications with Oscar.  Specifically, Defendant intercepted Plaintiff's: (i) prescriptions, (ii) medical conditions, (iii) income level, (iv) state and zip code, and (v) a unique Device ID.

46.    Defendant was able to use Plaintiff's unique Device ID to uniquely identify Plaintiff, assign Plaintiff a unique Amplitude ID, and build a profile of Plaintiff's activity on the Website.  Defendant then used the information it intercepted to train and improve its AI models, analyze and categorize Plaintiff's information, and assist Oscar with its marketing efforts.

47.    Neither Oscar nor Defendant procured Plaintiff's prior consent to Defendant's interception of Plaintiff's electronic communications, nor was Plaintiff aware that the same was occurring.  On the contrary, because Plaintiff was communicating sensitive medical information, he had a justified expectation that he was only communicating with Oscar and *not* with undisclosed third parties like Amplitude.

---

[19] https://amplitude.com/docs/data/destination-catalog.

48.     Plaintiff was in Pennsylvania when he accessed the Website and communicated with Oscar.  Upon accessing the Website, the Defendant instructed Plaintiff's browser in Pennsylvania to send the electronic communications directly to Defendant's servers.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff Willey seeks to represent a class of all persons who accessed the Website or App while in Pennsylvania, selected "Find A Plan," and entered information in response to subsequent prompts on the Website or App (the "Class").

50.     Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

51.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

52.     Excluded from the Class are: (i) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (ii) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (iii) the judge(s) assigned to this case and any members of their immediate families.

53.     Members of the Class are so numerous that their individual joinder herein is impracticable.  It is estimated that Class Members number in the thousands, if not more.  The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

54.    There is a well-defined community of interest in the common questions of law and fact affecting Class Members.  Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members.  Common legal and factual questions include, but are not limited to, whether Defendant has violated the WESCA and whether Class Members are entitled to actual and/or statutory damages for the aforementioned violations.

55.    The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other Class Members, visited the Website and had his electronic communications intercepted and acquired by Defendant through the use of the Amplitude Service.

56.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

57.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent

adjudication of the liability issues.

### CAUSES OF ACTION

### COUNT I
**Violation Of The WESCA,**
**18 Pa. Cons. Stat. §§ 5701, *et seq*.**

58.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

59.     Plaintiff brings this claim individually and on behalf of the Class against Defendant.

60.     The WESCA prohibits (i) the interception or procurement of another to intercept any wire, electronic, or oral communication; (ii) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (iii) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. §§ 5703(1)-(3).

61.     At all relevant times, by using the Amplitude Service, Defendant intercepted, acquired, read, and used the electronic communications of Plaintiff and Class Members on the one hand, and Oscar on the other hand.

62.     Defendant intended to intercept Plaintiff's and Class Members electronic communications.  Defendant contracted for the provision of the Amplitude Service on the Website and App, which Oscar paid money for.  Defendant provided guidance for Oscar to configure and install the Amplitude Service on the Website and App, and the Amplitude Service operated exactly as intended by Defendant on the Website and App.  Defendant also used the intercepted information to improve its products and services and bolster Oscar's marketing, advertising, and data analytics.

63.    Plaintiff and Class Members did not provide their prior consent to having their electronic communications intercepted by the Third Parties, nor did they provide their prior consent to having Defendant procure the Third Parties to intercept and use Plaintiff's and Class Members' electronic communications.

64.    Because the use of the Amplitude Service is not disclosed—certainly not before any wiretapping occurred—Plaintiff and Class Members were not aware that their electronic communications were being intercepted by Defendant.  Further, Defendant cannot avoid liability "merely by showing that [Plaintiff and Class Members] unknowingly communicated directly with [Defendant's] servers."  *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 129 (3d Cir. 2022).

65.    Plaintiff and Class Members had a justified expectation under the circumstances that their electronic communications would not be intercepted by Defendant.  Plaintiff and Class Members reasonably believed these communications would only be accessed by Oscar Health, and not by third parties like Amplitude.  Further, Plaintiff and Class Members were communicating sensitive medical-related information that a third party like Amplitude had no business acquiring. Indeed, the fact that Plaintiff and Class Members were communicating their PHI makes it obvious that Plaintiff and Class Members would not expect their electronic communications to be acquired by anyone other than Oscar—the entity with whom they were communicating—much less a large, data-driven tech company like Amplitude that uses the information to drive its customers' revenue.

66.    The wiretapping of Plaintiff and Class Members occurred in Pennsylvania, where Plaintiff and Pennsylvania Class Members accessed the Website and where Amplitude routed Plaintiff and Pennsylvania Class Members' electronic communications to Amplitude's own servers.  *Popa*, 52 F.4th at 131.

67.    Plaintiff seeks, on behalf of himself and each Class Member, (i) actual damages,

not less than liquidated damages computed at the rate of $100/day or $1,000 for each violation, whichever is higher; (ii) punitive damages; and (iii) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Classes under Rule 23, naming Plaintiff as the representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: October 7, 2024                    Respectfully submitted,

By: */s/ Yitzchak Kopel*
        Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel
Max S. Roberts
Caroline C. Donovan
Victoria X. Zhou

1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: ykopel@bursor.com
        mroberts@bursor.com
        cdonovan@bursor.com
        vzhou@bursor.com

*Attorneys for Plaintiff*